MARATHON OIL CO. et al. v. GULF OIL CORPORATION et al.

No. 3767.

Court of Civil Appeals of Texas. El Paso.

April 20, 1939.

Rehearing Denied in part May 25, 1939.
Rehearing Denied June 8, 1939.

R. F. Burges and Walter S. Howe, both of El Paso, Johnson & Crumpton, of Fort Stockton, A. M. Gee, of Findlay, Ohio, and R. C. Gwilliam and William Pannill, both of Houston, for plaintiffs.

H. L. Stone, of Pittsburg, Pa., P. O. Settle and Wm. L. Wise, both of Fort Worth, John E. Green, Jr., of Houston, Robt. T. Neill, Geo. T. Wilson, H. E. Jackson, John M. Davenport, and Charles Gibbs, all of San Angelo, and F. H. De-Groat, of Duluth, Minn., for defendants.

NEALON, Chief Justice.

Marathon Oil Company (which formerly had the corporate name of Mid-Kansas Oil & Gas Company) and Ohio Oil Company, the owners of a seven-eighths working interest in and to the oil and gas under Section 33, Block 194, G. C. & S. F. Railway Company Survey, in Pecos County, Texas, brought this suit against appellees Gulf Production Company, Gulf Oil Corporation and Gulf Refining Company to recover a portion of said Section 33, described as follows:

"Beginning at a stone mound on the south slope of ridge, marked 'SE 28-NE 23-Line 33-Lea,' and set by A. N. Lea for the southeast corner of Section 28, Block 194, and being southeast corner of Section 28, for the southwest corner of this tract;

"Thence north to the northeast corner of Survey 28, stone mound marked 'NE 28,' set by A. N. Lea for the northwest corner of this tract;

"Thence east 1100 feet to a point for the northeast corner of this tract;

"Thence south parallel with the west line of Survey 33, Block 194, to a point 1100 feet east of the southeast corner of Section 28, located as above stated;

"Thence west 1100 feet to said southeast corner of said Section 28, the place of beginning."

The appellants also sought to recover the value of seven-eighths of the oil produced by said appellees from said tract of land. R. Wilbur Brown and other owners of mineral and royalty interests

under the lease under which appellants claim joined in the suit in order to recover their alleged share of royalties. The lease under which appellants Marathon Oil Company and Ohio Oil Company claim was executed by Mrs. Bobbie I. Taylor and Mrs. M. A. Smith and husband and conveyed seven-eighths of the oil and gas under said land to the Transcontinental Oil Company, which thereafter assigned its interest to Mid-Kansas Oil and Gas Company. The Ohio Oil Company succeeded to the rights of the Marathon Oil Company. The named appellees will be hereinafter referred to as the "Gulf." The Marathon Oil Company, the Mid-Kansas Oil and Gas Company, the Transcontinental Oil Company and the Ohio Oil Company will be referred to, respectively, as the "Marathon," "Mid-Kansas," "Transcontinental" and the "Ohio," as may be necessary to identify them.

Appellants alleged that appellees entered upon the tract of land described about August 1, 1927, and drilled nine oil wells, designated as Numbers 1, 2, 3, 4, 6, 7, 8, 9 and 21, and up to January 1, 1937, produced large quantities of oil therefrom, and that the aggregate value of the seven-eighths working interest of oil so produced up to January 1, 1937, was $1,781,-073.00. They prayed for an accounting, for judgment quieting their title, and for the value of said seven-eighths interest.

It was admitted that said wells were located upon Section 33 as constructed by the decisions of the Supreme Court in Turner v. Smith, 122 Tex. 338, 61 S.W. 2d 792; Douglas Oil Company v. State, 122 Tex. 377, 61 S.W.2d 807, and Federal Royalty Company v. State, 128 Tex. 324, 98 S.W.2d 993, which held that the various sections of land constituting said Block 194 were to be located on the ground by running course and distance from the east line of Block Z, T. C. Ry. Co. Surveys. The Gulf owns, and has owned at all times involved in this litigation, an oil and gas lease covering Section 28 in said block. Reference is here made to Map No. 1 shown on page 797 of 61 S.W.2d, and to the texts of the Supreme Court's opinions in said case and other cases hereinbefore mentioned, to illustrate the relative locations of the lands involved and for an understanding of the issues involved and theories entertained as to the exterior and interior lines of Block 194 prior to said decisions.

In addition to filing a plea of not guilty, the Gulf pleaded specially that a short time after July 1st of 1927, Gulf and Mid-Kansas, both being uncertain as to the location of the true dividing line between Sections 28 and 33, entered into an agreement as to the location of the line; and that all of the wells the production of which is involved in this controversy are located within Section 28, as fixed by said agreed line; that said agreement was made with the knowledge and consent of the Transcontinental Oil Company, which at that time owned an undivided one-half interest in the seven-eighths originally conveyed to it by the owners of Section 33; and that both parties accepted said alleged agreed line and acted upon said agreement in developing their respective properties. The contention of the Gulf is that the line agreed upon was shown upon a map prepared by the Mid-Kansas and that said line was located by U. P. Kennedy, a surveyor for the Mid-Kansas, and was located about fifty feet west of the line which the executives of the two corporations involved had accepted as the common line between the two leases; that the two companies acquiesced in said line as a dividing line between the two leases and acted upon the assumption that it was so accepted for several years; and that the Mid-Kansas, in locating wells, in various applications filed with the Railroad Commission, designated said line as the west line of Section 33.

Gulf further alleged that the Mid-Kansas and its successor in title were estopped from now claiming that the west boundary line of the Smith-Taylor lease of Section 33 should be moved 1100 feet to the west as attempted in this suit, because in reliance upon the Kennedy line, which it alleged was designated by the Mid-Kansas as the west boundary line of Section 33, the Gulf had expended $389,409, in drilling and operating wells upon the land in controversy, and because the Mid-Kansas persuaded the Railroad Commission to allow it six full units on account of the reduced acreage in Section 33 effected by the Smith-Turner decision, thereby securing from the common pool all of the oil belonging to the Smith-Taylor lease as covering Section 33; and because the Mid-Kansas had accepted royalties from the Gulf Production Company from oil produced from the wells involved and executed transfer orders and indemnity bonds certifying and guarantee-

ing that it was the owner of said royalties, and acknowledging that said royalties were produced from Section 28.

Gulf also pleaded the three and four years statutes of limitations as to the alleged cause of action for the leasehold interest and the two and four years statutes of limitations as against appellants' suit to recover the value of oil produced from the disputed area.

Upon the conclusion of the evidence the Gulf, the Marathon and the Ohio each moved for an instructed verdict. A similar motion was made by such plaintiffs as were suing as owners of the royalty interests held in Section 33. The court denied the Marathon and Ohio's motion for an instructed verdict, but granted the motion presented by the plaintiffs suing as royalty owners for the value of their alleged proportionate parts of one-eighth of the oil produced from the wells involved. It also granted the motion of the Gulf Production Company, Gulf Oil Corporation and Gulf Refining Company for an instructed verdict as against the appellants for the seven-eighths mineral leasehold working interest. Judgment was rendered in conformity to the verdict. From said judgment respecting the seven-eighths working interest the Marathon Oil Company and the Ohio Oil Company now prosecute this appeal. The Gulf Production Company, Gulf Oil Corporation and Gulf Refining Company appealed from so much of the judgment as was rendered against them and in favor of royalty owners. Douglas Oil Company, joined by V. C. Hogan, J. L. Donahoe, Leo C. Donahoe and Irene Donahoe, claimants of royalty interests in Section 28, by cross assignment challenge so much of the judgment as was favorable to owners of royalty interests in Section 33.

All of Section 33, including the tract sued for, was leased by its owners, holding a regular chain of title under the sovereignty of the soil, in 1923, to the Transcontinental Oil Company. Later the Transcontinental Oil Company assigned a one-half interest to the Mid-Kansas Oil and Gas Company. The name of the Mid-Kansas was changed, by charter amendment, to Marathon Oil Company. On August 14, 1930, the remaining one-half of the lease in question was assigned by the Transcontinental Oil Company to the Mid-Kansas Oil and Gas Company; and subsequently the lease was assigned by Marathon Oil Company (being the Mid-Kansas with a

change of name) to appellant, the Ohio Oil Company. In this lease Section 33 was described simply by the original abstract, section, and certificate numbers and the name of the original grantee.

In January, 1924, the Gulf Production Company acquired an oil and gas lease upon Section 28 of Block 194.

According to their original field notes, the forty-two sections in the eastern part of Block 194 are bounded on the west by Block Z, on the south by Block 178, on the east by the River Surveys, and on the north by the Runnels County School land. The Land Commissioner, in 1886, deleted the calls for the Runnels County School land on the north and for the River Surveys on the east, leaving these forty-two sections bounded on the west by Block Z and on the south by Block 178. John Monroe became the owner of Sections 31 and 33 and I. G. Yates became the owner of Sections 30, 32 and 34.

Ira G. Yates and others caused the Land Commissioner, in November, 1915, to appoint Captain R. S. Dod to survey, among other lands, Sections 30 to 34, inclusive, Block 194. Dod made the survey and filed his reports in the Land Office (which were finally accepted) showing 2486 acres of land between the east boundary of Sections 30, 31, 32, 33 and 34, as he located them, and the west boundary line of the River Surveys referred to in the decisions cited.

A tract of 2486 acres, sometimes referred to as the Big Yates Vacancy, was patented to I. G. Yates and others and Yates subsequently leased a portion thereof to the Transcontinental Oil Company, which had assigned a one-half interest therein, as well as in other leases it owned or thereafter acquired, to Mid-Kansas Oil and Gas Company, and thereafter, on August 14, 1930, assigned the remaining one-half interest in said lease to Mid-Kansas Oil and Gas Company. The field notes of the Mid-Kansas Oil and Gas Company's and Transcontinental Oil Company's lease on the Big Yates Vacancy call for Section 33 to adjoin it on the west; and the field notes of Section 33 call for Section 28 to adjoin it on the west.

On December 20, 1924, Mrs. M. A. Smith and husband, individually and as agent for the State of Texas, executed a mineral lease, known as the M. A. Smith lease, conveying seven-eighths of the minerals under Section 28 to E. C. Marrs, who,

on January 28, 1925, assigned that lease to Gulf Production Company. The California Company held a lease on Section 34 immediately to the north of Sections 28 and 33. Section 33 is bounded on the west by Sections 28 and 34.

There were at least three well known theories of locating Section 33 in the early part of 1927. One was that it adjoined the River Surveys on the east; another (the "Turner" method) located it by course and distance only from the east boundary of Block Z, and the third (the "Dod" method) was that it was bounded on the east by what is known as the Big Yates Vacancy and on the west by Sections 23, 28 and 34. Further information with respect to these methods may be gleaned from the reported decisions in Douglas Oil Co. v. State, 122 Tex. 369, 61 S.W.2d 804, and Smith v. Turner, 122 Tex. 338, 61 S.W.2d 792; Id., Tex.Civ.App., 13 S.W.2d 152.

Litigation involving these methods started in July, 1927, by the filing of what is known as the Turner-Smith case. On May 13, 1933 the Supreme Court decided that the Turner method, that is, that the east boundary of Section 33 should be located by the calls in the original field notes for course and distance east from the east line of Block Z, was correct; thus leaving one hundred forty-three and a half acres of land, known as Turner Tract 1 and about twenty acres out of Turner Tract 2, between Section 33 and the Big Yates Vacancy.

### Opinion.

The record in this case is very voluminous. The statement of facts consists of more than 3000 typewritten pages. The transcript contains 287 pages. The various printed briefs and arguments contain 1153 pages. The briefs and printed arguments presented the conflicting theories with clarity and force. In preparing the indices of their respective briefs the contending parties indicated the topics treated under each indexed assignment and proposition—a method that was of great assistance to us, and which we commend to counsel filing briefs in the future.

As to the seven-eighths working interest claimed by the Gulf and Ohio Companies, the Gulf's contention was: (1) That in 1927 there was a dispute as to the location of the boundary between Sections 28 and 33; that the Mid-Kansas, with authority to represent its co-tenant, the Transcontinental, and the royalty owners holding in Section 33, made a specific agreement as to a location of the line, and thereafter both the Gulf interests and the Mid-Kansas and its successors in interest, acted upon the alleged agreement, developing the oil resources of the property in reliance upon it; and, it further insists, if there was no express agreement, those under whom the Ohio holds and to whose interests it has succeeded, by the words and conduct of their officers, by the representations made at various places, and especially with reference to proration procedure and in other ways, induced the management of the Gulf Companies to believe that the Mid-Kansas acceded to the line agreed upon and would respect the alleged agreement; and as a result the Gulf proceeded to expend large sums of money drilling wells upon the now disputed tract; that by reason of the situation thus produced it has been placed in such position that should the Ohio prevail in this proceeding the Gulf will have lost its opportunity to extract its lawful allowance of oil from Section 28 during the time following July, 1927, and up to the time of the filing of this suit—July 25, 1933.

The Ohio contends that there was no dispute as to the location of the boundary between the two survys; that the representatives of the Companies did not enter into an agreement to settle a dispute as to the location of the true boundary line, but that the agreement was to find where the R. S. Dod line would run were it located upon the ground, both Companies believing that the Dod line was the true boundary separating the two properties. It contended also that the elements of estoppel were lacking, in that it did not represent that it was settling a dispute by acquiescing in the Dod line as the true boundary between the surveys; that the Gulf officials did not rely upon any alleged agreement of such a character or upon any alleged conduct of the Mid-Kansas officials or representatives in pursuing their development program, but relied upon their own belief as to the location of the line—a belief which the Ohio alleges was based upon independent investigation made by the Gulf. The Ohio also contends that it was not possible for the Marathon to make an agreement settling a boundary dispute in the absence of the joinder in that agreement of its co-tenant, the Transcontinental, and the royalty owners whose interests were involved.

The first problem that presents itself is that of determining whether, after considering all the evidence favorable to appellants Ohio and Marathon and considering none that is contradictory thereof, we may say that the undisputed evidence required the instructed verdict upon which the judgment was entered.

First, we will consider the evidence as to an agreed boundary line. We think it is not in dispute that all were of the opinion that what was known as the R.S. Dod method furnished the proper method of determining the area of the various sections and their boundaries, and that a survey made by the California Company correctly applied the Dod method to the ground. The Gulf claims that U. P. Kennedy, a location surveyor for Mid-Kansas, in July, 1927, contended that the line was fifty feet or 15 or 20 varas west of the location which the Gulf engineers had determined was the California line. The chief engineer for the Gulf, Mr. Woodbury, testified that he told his surveyor, Pierce, upon whom devolved the duty of locating Gulf No. 1 well, that if the difference between Pierce and Kennedy as to this issue amounted to only 15 or 20 varas he should accept Kennedy's measurements. One of the questions and answers with respect to this issue was: "Q. If he went out there and decided it was right about it—just accept Kennedy's measurement?" "A. Surely." The conversation which produced this instruction was one to which Mr. Woodbury, Mr. Kennedy, Mr. Pierce and Mr. Fuller (also representing the Gulf) were parties.

Mr. Pierce testified that he had not read the Dod report, and was not familiar with the Dod method of locating Block 194; that he had received instructions from Woodbury to make this location (of Gulf Well No. 1) from the California Pipe; at that time he believed there were no Mid-Kansas corners in that vicinity; all the corners that he found were California corners marked by the California Company or the Marland Oil Company; that after he made a corrected location about 1000 feet south of the north line and about 250 feet west of the east line of Section 28, he, in company with Messrs. Woodbury and Fuller, visited Mr. Kennedy concerning that location, because the latter had located the well for Mid-Kansas directly east of the corrected location 500 feet; that Kennedy said he had not made his location

from a line but had made it east of the Gulf well, "and that according to the distances that he wanted to satisfy on the ground there was a conflict between the line that we had located our well from and the line that he wanted to locate his well from —some 15 or 20 varas was the discrepancy; that he did not agree with the line that we were using; that the line he would like to use was about 15 or 20 varas west of the line we were using in conflict with our line." The witness further testified, however, that Kennedy stated that he did not want to make that a final statement because surveyors, like others, make mistakes and he would like to check his work; that Woodbury told Kennedy that if the discrepancy was of no appreciable amount more than that stated, the Gulf would be satisfied and would move back west and recognize his claim. He quoted Kennedy as saying that he was glad that they had finally found a line from which they could locate their wells, "and from which the Mid-Kansas agreed and the Gulf would agree on."

As to the conversation with Kennedy, Woodbury testified that Kennedy said that Gulf had crowded his Section 33 a little bit and were over on him something like 15 or 20 varas; that he wanted to move his lease line west; that he hadn't given Section 33 its proportionate part of the excess across that block; that witness told Kennedy that they had endeavored to apportion the excess across the block and if they hadn't done it he thought they should do it; that he told Kennedy, Fuller and Pierce that he thought they should get together and adjust that and allow Mid-Kansas "that proportionate part of that distance"; that Kennedy said the line would then be agreeable to him; that all he was asking for was that he should have the proportion. Woodbury testified that before making a location on Section 28 the California Company and the Gulf engineers were in agreement upon the California's theory of "prorating excesses east and west."

Kennedy testified that Woodbury, when he visited the Mid-Kansas camp, said he had come in regard to "whether they had located their location 250 feet from the line as we saw it, according to Dod's interpretation of the sections in Block 194"; that he (Kennedy) told Woodbury that he figured Gulf was crowding the line approximately 50 feet and after a short discussion Woodbury came to the conclusion that it would

be best to move the line 50 feet west; that there was a discussion about prorating the excesses through Block 194 and that was the reason for Woodbury's conclusion—that is, that it should allow Section 33 to have its proportionate part of the excess "as * * all thought it should be given"; that his best recollection was that the California Company had set a corner within 10 or 15 feet of where he figured the northeast corner of Section 28 should be; that this corner had a pipe in it, and that was the line that he and Mr. Woodbury decided was correct after allowing the excess—proration of excesses; that he never staked a line running south 50 feet west of the California corner as the east line of Section 28; that he never made any location or did any surveying when Pierce was along; he staked the location of Mid-Kansas well No. 7 in reference to the line that he and Woodbury agreed upon.

I. R. Collier, one of the engineers of Mid-Kansas, and under whom Kennedy worked, testified that before Gulf's No. 1 well was located he had had no discussion with an engineer from any other company; that he had met with engineers in the latter part of June, 1927, in Fort Worth, at which meeting Woodbury was present as well as an engineer of the California Company, and that the idea of the engineers was to conform "as near as possible" to the Dod theory of locating lines; that he understood the excess was to be prorated between the different sections of Block 194; that he understood the California Company had made a survey on that theory, his information coming from Mr. Taylor representing that Company; that he found a monument set by Mr. Taylor for the northeast corner of Section 28 as he located it on the ground; that the Gulf Production well No. 1 was located 198 feet west of the California line; that his understanding was that all were using the same method that was used by the California Company; that in September, 1927, he heard of the Smith-Turner case; the witness received from Mr. Fleming, Vice President of Mid-Kansas, a letter written by Mr. Adams, General Agent of the Gulf, enclosing field notes of a boundary agreement that Mr. Adams wished to make in writing with the joinder of all royalty and lease owners in Sections 34, 33 and 28; that he corrected the field notes; that at the time he received this letter he had not learned about the Fred Turner suit; that after hearing of the Turner suit he recommended to Mr. Fleming that he make no

boundary agreement, this recommendation being made in a letter dated September 14, 1927; that the Mid-Kansas had no party in the field to make surveys but the Gulf and California Companies did have; that Mid-Kansas accepted the Gulf's work when it relied upon the true position of Dod's line—accepting that as being the position of Dod's line; that Gulf's representative said it was the true position of Dod's line; the Dod line was acceptable; we accepted the Dod line; the next morning after the location of Gulf No. 1 was changed, Collier talked to Mr. Taylor, of the California Company, and Taylor said that Gulf and California agreed that the line as he ran it was the approximate position of the Dod line, and witness told him that if they would put that excess in it "that was all right with us, we would abide by it."

It is not disputed that both the Gulf and Mid-Kansas, after the conference between the engineers, spaced their wells, filed their notices of intention to drill, drilled their wells and reported to the Railroad Commission the completion of their wells with reference to the line agreed upon in the conference. Field maps used by both Companies showed the wells to the west of the line as belonging to the Gulf and those to the east as belonging to Mid-Kansas, and oil from the field was prorated and distributed upon the theory that these representations were correct. The Mid-Kansas purchased royalty under the M. A. Smith lease of Section 28 with reference to this line and collected royalties from the wells which it now seeks to recover, but the Gulf required an indemnity agreement before paying the royalties.

In addition to the evidence of the engineers affecting the question of whether the transaction was in settlement of a boundary dispute there is also in the record evidence of Vice President Fleming of the Mid-Kansas in which he flatly denied making any agreement in any form with Gulf as referred to in any of the correspondence with respect to the alleged agreed line; that he knew · Gulf was claiming the wells in controversy; that never at any of the meetings did he tell Mr. Adams of the Gulf that the wells belonged to the Mid-Kansas, though he knew the Gulf was drilling in the now disputed area; that U. P. Kennedy was sent out to do general surveying and to locate wells; that primarily Kennedy's duty was to locate wells; that he had no authority to locate them unless he was advised to do so;

that he understood that the engineers agreed upon a line for a common line; that at the time he wanted an agreement to drill all offsets a distance of 250 feet from that line; that there was a squabble on as to where the line was and the initial well was drilled approximately 200 feet from a line that was between the two leases; that he believed Mr. Kennedy had never reported that line to him; that he got his information from Collier; that on August 29, 1927, he wired Adams that it was his understanding that the two producers had made their locations 250 feet from a common line, but that the engineers of both met on the ground and moved the Mid-Kansas location 100 feet west to absorb excess, making both locations 200 feet from a common line, "by which he meant the line between the two leases," the telegram concluding "Our understanding your engineer agreed to this and supposed you had been notified. Advise if satisfactory." On September 1st he received a wire from Adams saying that Gulf's engineer reported no agreement had been reached with the Mid-Kansas man on location, but that there was so little difference as to distance of wells from lines that Gulf withdrew its protest against present location as there seemed to be some misunderstanding about section lines. The telegram concluded "and after further investigation later may be better for us to reach definite agreement on locations this locality," by which Fleming understood Adams meant locations of wells. To which Fleming replied that he was sorry about location and was taking the matter up with Mid-Kansas engineer then in Del Rio, "and * * that we should later consult on future locations and location mutual line." September 7, 1927, Adams wrote Fleming as follows: "After receiving your message of September 2nd, we have decided it would be to the best interest of all parties concerned who hold leases on Sections Nos. 34, 33 and 28, in Block 194, GC&SF Survey, Pecos County, to agree upon certain lines and corners, as follows:" The letter sets forth a field-note description to be used in the proposed agreement. The description includes and described the proposed dividing line between Sections 28, 33 and 34 and concludes:

"The above points and calls can be located on the ground, and after considering these facts, think you will agree with us, that to have these corners and lines defi-

nitely established and agreed upon would be better for all of us.

"Upon receipt of your approval of this idea, we will draft an agreement setting out the above mentioned lines and corners and forward same to you for execution. We also believe that it would be well to have the lessors and royalty owners join with us in this agreement, and will thank you to forward us abstracts of title covering Section 33 so we can get the proper mineral owners included in this agreement."

The day after receiving this letter Fleming replied acknowledging its receipt and stating that he had forwarded the letter to Mr. Collier, then in Texas, and had asked for his recommendation. On September 13th Fleming addressed another letter to Adams stating, in substance, that Mid-Kansas engineers advised him that Mr. Taylor, the California Company's engineer, had stated that the Gulf and California engineers had agreed that the proper way to divide the excess was to apportion it to the different sections; that Mr. Collier had advised Kennedy that he thought that was the best solution of the matter; that as Mr. Taylor had talked to the Gulf engineer that morning Collier had not thought it necessary to get them all on the ground as they had definitely decided on the amount to be given to Section 33 as well as the corners that had been used to determine it, and therefore Collier and Kennedy ran the line measuring the Gulf location as being 198 feet from the Mid-Kansas line and the Mid-Kansas No. 2 location the same distance; that since receiving Adams' telegram of August 29th Kennedy had gotten in touch with Fuller, of the Gulf Company, who stated that the way he then figured it the Mid-Kansas location was 194 feet from the line and the Gulf location 207 feet from the line; but that if there was an error of 13 feet and the Gulf desired Mid-Kansas to do so, it would be glad to make it up in any other location where Mid-Kansas offset Gulf. He further advised that in the future in making locations Gulf engineers consult with Kennedy so that they might locate both wells at the same time. The letter contains this paragraph: . "Your letter of September 7th has been sent to Mr. Collier, in accordance with my letter to you of September 8th and this letter in no way changes our arrangement regarding that matter."

September 16, 1927, Fleming wrote Adams with respect to the field-note descriptions to be used in the proposed boundary agreement, stating that Collier had made a careful survey of the proposed line, and as a result had arrived at a certain description, which was given, adding, "we cannot see that this difference affects us materially, and will thank you to advise us if the above description is acceptable to all parties concerned." Adams did not reply to this communication.

The Turner suit, based upon what has been referred to as the Turner theory, was filed in the District Court of Pecos County July 27, 1927, and Woodbury testified that he learned of its filing shortly thereafter. Collier testified that he learned of the suit being filed through a newspaper publication and immediately wrote Fleming recommending that no boundary agreement be concluded.

About this time Judge Sutton, who presided over the trial of the Smith-Turner case in the District Court, instructed A. N. Lea, County Surveyor, to make a resurvey of Block 194, working east from Block Z and giving 1900 varas to each section. September 23, 1927, Collier, of the Mid-Kansas, wrote to Woodbury of the Gulf and the engineers of other companies interested calling attention to this order of the District Judge, and adding: "While the Mid-Kansas is more vitally interested than any of the companies yet if the excess is declared to be there it will move all the section lines west of where we have located them, Judge Sutton's instructions being to work east from Block Z giving 1900 varas to a section, which will shove all the excess that has been apportioned to the different sections to the east side of the block. This will necessitate shifting all the interior lines and no doubt will cause a lot of trouble to all concerned." Though Mr. Woodbury received this letter the record contains no reply.

On May 6, 1930, during the pendency of the Turner-Smith suit, Mr. Adams of the Gulf addressed Messrs. Fleming of the Mid-Kansas and Clark of the California, referring to a proposed location in the northeast corner of Section 22, saying that he was authorizing the location 360 feet each way out of said northeast corner, reciting that it was on the Smith property and offset holdings of the Companies addressed. Section 22 lies south of Section 28 and the east line of Section 22 is an ex-tension of the east line of Section 28. Replying to this letter under date of May 7, 1930, Mr. Fleming said:

"In view of present unsettled conditions *of all boundaries* of Block 194 of GC & SF Ry. Co. Survey, Pecos County, Texas, we regret that you find it necessary to drill another well on land that may most probably be annexed to another section. Under the theory of the Turner case and that of the California case *the west line of Sections 31, 32, 33 and 34, Block 194* may move westward. Enough so as to place your proposed well No. 25 on Section 21. If an offset thereto is drilled by California it may hereafter result that the same may be annexed to our Section 31. If we shall feel obligated to drill an offset to this new well it should remain on Section 21. In addition to the probability of the above described west line being moved westward we believe that it is possible that the north and south boundary lines of said sections may be moved, so that under all these circumstances we believe that any operator drilling a well on land that may be annexed to another section is doing so at his peril.

"By the California decision the common line between Surveys 21 and 22, Block 194, GC&SF Ry. Co. Surveys moves westward approximately 366.7 varas. Could it not reasonably serve your purpose to take this into consideration in locating your new well and thus avoid any possibility of trouble hereafter, which, if the theory of the Turner and California cases is upheld, is most certain to occur.

"It is not my purpose to suggest how you should conduct your business but the question of boundary location is very important and sooner or later is going to be settled by the courts, and it seems to me we should consider this most important fact and therefore avoid as much complication as possible."

Adams replied under date of May 12, 1930, in the following language:

"Receipt is acknowledged of your letter of May seventh regarding our location on the Smith land in Section 22, Block 194, Pecos County.

"We appreciate very much your discussion of boundary difficulties in this field; however, all of this has been taken into consideration before arriving at the decision to drill the line locations and we feel that regardless of our apprehensions there

is no middle ground to follow and that we are justified in assuming whatever risks may exist in the drilling of this location."

These last two letters are important in the consideration of the plea of estoppel urged by Gulf, as well as in passing upon the question of whether or not the minds of the representatives of the Gulf and Mid-Kansas had ever met upon the question of "agreed boundaries."

Under date of October 13, 1933, R. Wilbur Brown & Company, owners of royalty interests in Section 33, wrote Gulf, calling attention to the fact that the Turner-Smith case had been decided by the Supreme Court on May 13, 1933, and requesting payment of royalties accruing as a result of the Gulf's operation of the wells in controversy. The latter replied that payment could not be made on royalty interests pending certain litigation, but when its attorneys felt payments of royalties could be released, it would consider the matter. No mention of any claim of "agreed boundary" was made.

While our summarization of the facts is far from complete and omits numerous details that might affect the contention that Mid-Kansas "adopted" the alleged Kennedy line, it sufficiently indicates the issues made in evidence and the proof offered to demonstrate that no verdict should have been instructed adversely to the Ohio and Marathon.

The evidence in this case seems to us to establish conclusively the following state of facts: The Mid-Kansas and Gulf Companies, as well as other producing companies operating in Block 194, were of the opinion that the Dod method of constructing the block and the sections thereof was the correct method, and that the excess should be awarded to the various sections proportionately. The two producing companies here involved had determined, each independently of the other, that this method was the correct one and that wherever under this method the line between Sections 28 and 33 would fall would be the true line. There was no boundary dispute between them. There was but one question to be settled and that was the location of the Dod line. Before the alleged fixing of any Kennedy line the Gulf and the California had agreed upon this method and the California had set a monument for the northeast corner of Section 28. The task set for the surveyors was to find that line.

It cannot be contended that there was any written agreement settling the boundary between the two producing companies involved. The correspondence negatives the idea that an express agreement had been made or an unauthorized agreement of subordinates ratified.

Then, too, in the absence of a dispute or uncertainty as to the real line between the sections, no parol agreement can be effective. If effect is to be given to the Supreme Court's decisions affecting Block 194, it must be held that there was no uncertainty as to the location of the line between Sections 28 and 33. That line was susceptible of exact location by the application of the Turner method. It developed from these decisions that both producing companies, as well as other producing companies in Block 194, labored under a mistake of fact. If it could be said that a parol agreement as to the location of the true line was made, it must be admitted that it was based upon a mistaken theory— a mutual mistake of fact. So, too, was any adoption of the line or acquiescence in the consideration of it in developing the property.

We understand the rule to be that in such a situation a parol arrangement is not enforcible unless there is some element of estoppel rendering disregard of it inequitable. This rule has been recognized in Texas and in a number of other states. It was recognized in Cummings v. Williams, Tex.Civ.App., 269 S.W. 845, 847, writ of error dismissed, in which it was claimed that the location of a certain fence fixed a boundary by agreement. The court said:

"If, however, this evidence shows an agreement or contract as to the location of the line, when the undisputed evidence shows that both parties were mistaken in believing that the fence was on the line, their agreement that the pickets rather than the posts of the fence marked the exact location of the line would not make the agreement that any part of the fence was on the line binding upon either. Appellant pleaded that any agreement made as to the location of the line was made under a mutual mistake of fact and was not binding.

"To enforce a mutual mistake, Judge Wheeler said in Harrell v. De Normandie, 26 Tex. [120], 126, 'defeats the real intention of the contracting parties.'"

The court in that case referred to what it termed the "leading" case of Randleman v. Taylor, 94 Ark. 511, 127 S.W. 723, 724, 140 Am.St.R. 141, in which it is said with respect to certain contentions:

"To sustain their contention, counsel for appellant rely upon the case of Schraeder Mining & Manufacturing Company v. Packer, 129 U.S. 688, 9 S.Ct. 385, 32 L.Ed. 760, in which the court hold: 'A consent by coterminous proprietors of real estate to mark a boundary line supposed to run according to the marking between undisputed tracts, given by both in ignorance of the real facts, and of the existence of a conflict, does not estop either from claiming his rights when the mistake is discovered; nor can it be construed as a license from the one party to the other to cut timber on the disputed tract up to the mistaken boundary line.'

"The evidence in the case at bar shows that appellant and appellee agreed upon a boundary line under the belief that it was the true line, when in fact it was not, and that immediately the timber was cut, and removed from the land. In short, it was an erroneous line agreed upon by mistake. In such cases the agreement is not binding, but may be set aside by either party when the mistake is discovered, unless there is some element of estoppel which prevents him. 4 Am. & Eng. Enc. Law (2d Ed.) p. 862. It is only where the true line is unknown or is difficult of ascertainment, and the parties establish the line to settle a disputed and vexatious question as to the boundary line between them, that the agreement is binding. In such cases the mutual concessions between the parties is a sufficient consideration for the agreement. In the present case the boundary line was not incapable of ascertainment." See also: Ware v. Perkins, Tex.Civ.App., 178 S.W. 846, 847; Bohny v. Petty, 81 Tex. 524, 17 S.W. 80; Davidson v. Pickard, Tex.Civ. App., 37 S.W. 374; Murphy v. Benson, Tex.Civ.App., 245 S.W. 249; Hunter v. Malone, 49 Tex.Civ.App. 116, 108 S.W. 709; Blank v. Ambs, 260 Mich. 589, 245 N.W. 525, 526.

The effort of the surveyors was to establish the Dod line in order that agreement might be made as to locations of wells. The Smith-Turner case, based upon a conflict with the Dod theory, was filed before the completion of any of the wells involved. As stated, neither of the parties hereto advocated the Turner theory, and there was no dispute between them as to the proper theory to be applied.

We are not holding that if the parties, for reasons that seemed expedient to them, agreed orally or in writing to fix a line by which they would abide irrespective of the outcome of the Smith-Turner case, that such a contract would not be binding, nor that a boundary agreement is invalid merely because the agreed line is not the true line. Neither of such situations is here presented.

We think that under the undisputed evidence no element of estoppel is present to operate in favor of Gulf. It does not appear that Gulf was induced to locate its wells by any representation made by Mid-Kansas. It was not made to appear that it would have refrained from any of its drilling operations had Mid-Kansas objected to them. It in fact had located its first well within the disputed area without conferring with representatives of Mid-Kansas and before that Company had made any locations in close proximity to the alleged Kennedy line. In September, 1927, before the Gulf's second well was drilled in the chief engineer of Mid-Kansas had warned the chief engineer of Gulf that if the Turner theory were upheld it would necessitate the moving of all lines westerly from where the surveyors and engineers had located them. For the same reason at a later date both Mid-Kansas and California officials warned Gulf against drilling at a proposed location in Section 22. It cannot, therefore, be said that drilling subsequent to Well No. 1 was made with reliance upon any belief that Mid-Kansas would not demand its legal rights in the event the Turner theory were sustained. That theory was sustained. The Supreme Court has in effect declared that the land in dispute belongs to Section 33. This constitutes a declaration of the legal rights of Mid-Kansas and those holding under it. No equitable ground for denying these rights appears from the record. Hunter v. Malone, supra.

The Gulf interests have interposed a plea of the statute of limitations, Vernon's Ann.Civ.St. Art. 5526, as a bar to the recovery of the value of oil extracted prior to July 25, 1931. By agreement the date on which the suit was filed was fixed as July 25, 1933. We think this defense is valid. When the oil was separated from the soil it became personalty. Jones v. O'Brien, Tex.Com.App., 251 S.W. 208;

Hager v. Stakes, Tax Collector, 116 Tex. 453, 294 S.W. 835. At all times the representatives of Mid-Kansas and Ohio knew that Gulf was claiming title to the oil. The adverse possession began and consequent conversion took place, therefore, immediately upon Gulf's bringing the oil to the surface and placing it in the pipe lines or other depositories. The courts were open to the Mid-Kansas and Ohio as they were to Fred Turner. The Ohio, therefore, is entitled to recover seven-eighths of the value of the oil produced from the wells in controversy subsequent to July 25, 1931, and prior to July 25, 1933, less costs and expenses, including taxes, incurred and paid in operating the lease, with interest thereon from said day at the rate of six per cent per annum, and the amount of production subsequent to July 25, 1933, less the same character of charges and expenses if incurred in good faith, with interest upon the net realizations from the dates thereof.

■ The Ohio declines to credit Gulf with the expenditures made since July 25, 1933, though it agrees to the validity of such credits prior to July 25, 1933. Though the filing of the suit put Gulf upon notice of the Ohio's intention to press its claim, we cannot say as a matter of law that Gulf did not act in good faith in making the subsequent expenditures. It urged a claim of sufficient apparent merit to convince the District Court of its validity. One may be a possessor in good faith and yet not be the owner of the better title. Dorn v. Dunham, 24 Tex. 366. Good faith in developing a tract of land for oil and gas depends upon the possessor who so develops having an honest and reasonable belief in the superiority of his title. Upon this issue Gulf is entitled to a jury finding. Gulf Production Company v. Spear, 125 Tex. 530, 84 S.W.2d 452.

■ We now consider the rights of the intervening royalty owners. They differ from those of the Ohio and Marathon. As to the portions of production claimed by royalty owners Gulf was not claiming adversely. It claimed for itself only the seven-eighths working interest, which it held adversely to Mid-Kansas and Ohio. Likewise Gulf's lessor, the State of Texas, by intervening in the Turner-Smith case and adopting the "Turner theory," in effect, repudiated any claim to royalty interests within the disputed area. As to that area it was not the lessor of Gulf and

its position in the Smith-Turner case was contradictory of such a claim. The defense of limitation, therefore, is not available to Gulf as against the royalty owing plaintiffs.

■ Gulf's liability to royalty owners for interest dates from the time of the latter's demand for an accounting. It may not be disputed under the facts of this case that Gulf was an innocent trespasser upon the disputed area and acted in good faith in taking possession of the oil extracted therefrom. It did not know to whom the reserved royalty belonged until May, 1933, when the Supreme Court decided the cases involving Block 194. Therefore, no conversion resulted until demand was made. West v. Rule, Tex.Civ. App., 195 S.W. 230; Employers' Fire Ins. Co. v. Cotten, 245 N.Y. 102, 156 N.E. 629, 51 A.L.R. 1465. The earliest demand shown in the record is October 11, 1933. Our judgment will, therefore, be that the various royalty holders recover the amounts of principal stated in the judgment of the district court, but that that judgment be reformed so as to allow interest at the rate of six percent per annum from *October 11, 1933* upon the value of the "royalty oil" produced prior to that day and at the same rate from dates of production for the "royalty oil" produced subsequent to that day up to and including November 30, 1937, without prejudice to the royalty owners' right to recover for their respective shares of production subsequent to said last specified date, with interest upon this judgment from November 30, 1937, at the rate of six percent per annum.

In harmony with the views herein expressed, the judgment of the district court as between the Gulf Production Company, Gulf Oil Corporation and Gulf Refining Company and the Ohio and Marathon Oil Companies is reversed and remanded.

Since the calculations involved are numerous and intricate and call for the inspection of four volumes of documentary evidence, we place upon the intervening royalty owners the duty of ascertaining the amounts recoverable by them under the principles herein stated and filing statement of the same, with correct references to the record, with the Clerk of this Court within fifteen days, at the same time submitting said statement to opposing counsel that all calculations may be checked with respect to the amounts of their recovery;

(stipulations as to correct calculations to be without prejudice to the parties' rights to challenge the Court's determination of liability and the limits thereof); and the judgment of the district court as between the said intervening royalty owners and the various Gulf corporations as herein modified is affirmed, the judgment of affirmance being conditioned upon compliance with the Court's order as to filing a statement, in default of which this branch of the case will also be reversed and remanded.

The cross assignment of Douglas Oil Company and those joining therein is overruled.

### On Rehearing.

■ All parties filed motions for rehearing. In view of certain of the arguments contained in the motion for rehearing and in the separate printed argument of the Gulf Corporations we think it wise to clarify our former opinion. First, we desire to relieve counsel of the misapprehension that we held that a parol agreement as to the location of a boundary line could not be upheld if the parties believed that the agreed line was the true line when such was not the case. Nor are we to be understood as holding that when great confusion, uncertainty or doubt exists as to the location of a boundary line there is not present sufficient basis for a valid agreement as to such location. We are concerned here with the facts of this particular case. The Gulf pleaded specifically that the engineers of the contending parties had been authorized to "meet, determine and agree upon a dividing line between said two surveys, to be used and observed by said Companies in the location and drilling of the wells along said boundary line." Insofar as Gulf depends upon an express agreement, it committed itself in its first amended original answer to such agreement, if any, as was made by the engineers of Gulf Production Company and Mid-Kansas Oil and Gas Company at two meetings, the first of which was held July 12, 1927. The burden of proof as to this defense rested upon Gulf. We hold that there is no evidence of an agreement by the Corporations that the so-called Kennedy line or the so-called California line should be regarded as the boundary between Sections 28 and 33.

We also concluded and held with respect to the contention of Gulf that the Mid-Kansas Oil & Gas Company and its successors in title, by acquiescing in the use of said line as the boundary between the two sections and by so representing it and drilling wells with reference to it, were not estopped from asserting ownership to the true west line of Section 33. We concluded and held that there was no evidence that the conduct of the Mid-Kansas Oil & Gas Company and its successors in title in this respect misled the Gulf Production Company to its injury, and that there was no evidence that had it not been for the conduct of the Mid-Kansas Oil & Gas Company the Gulf Production Company would have refrained from drilling the wells that are the subject of controversy.

We concluded, upon the undisputed evidence, that the two years' plea of limitation interposed by the Gulf Production Company should be sustained as to oil produced from said wells prior to July 25, 1931, and denied Mid-Kansas Oil & Gas Company and Ohio Oil Company judgment for said value. The amount thus retained by the Gulf Production was much more than the amount expended by Gulf in drilling and operating the wells.

■ We shall now consider the motion of appellants Ohio Oil Company and Marathon Oil Company. These appellants insist that we erred in holding that the Gulf is entitled to an allowance for operating expenditures made after July 25, 1933, provided the expenditures were made in good faith. In support of this assignment of error it is urged (1) that since the remedy invoked is an equitable one, it must appear that the party invoking it is not refusing to do equity in connection with the matter at issue, and (2) that by taking advantage of the statute of limitation to defeat the recovery of the value of oil converted by it prior to July 25, 1931, Gulf is refusing to do equity. We think these contentions are sound. Certainly it is true that the remedy sought is equitable, and should not be granted one who refuses to do equity with respect to the transaction involved. Republic Natural Gas Co. v. Huddleston, Tex.Civ.App., 120 S.W.2d 319; San Antonio & G. S. Ry. Co. v. San Antonio & G. R. Ry. Co., 25 Tex. Civ.App. 167, 60 S.W. 338, writ refused. It is likewise true that while the statute of limitations bars the legal remedy, it does not discharge the debt. Fievel v. Zuber, 67 Tex. 275, 3 S.W. 273; Orndorff v. State, Tex.Civ.App., 108 S.W.2d 206,

writ refused, and cases therein cited. The Gulf owes the Ohio the value of the oil converted since 1927. As to the recovery of more than six hundred thousand dollars of this value, the law now affords the Ohio no remedy. The Gulf seeks credit for expenditures amounting to $63,047, without tendering payment of its debt to the Ohio. Equitably the amount converted less necessary expenditures made in good faith, belongs to the Ohio, and if it were shown that the Gulf acted in good faith in making expenditures since the filing of suit, the credit should be applied by a court of equity to the oldest items of the debt, since the process of conversion was continuous. It would therefore be futile to remand the cause to ascertain if the expenditures were or were not made in good faith, since in neither event would the judgment be affected. The fact that a portion of the debt upon which the expenditures would be credited is barred by the statutes of limitation does not affect the rights of the creditor in this respect. As to the principle stated see San Antonio & A. P. R. Co. v. Gurley, 92 Tex. 229, 47 S.W. 513; United States & Mexican Trust Co., v. Delaware W. Const. Co., Tex.Civ.App., 112 S.W. 447, at page 461; Stark v. Cooper, 203 Mo.App. 238, 217 S.W. 104. The rule is thus stated by eminent authority: "The meaning is that whatever be the nature of the controversy between two definite parties, and whatever be the nature of the remedy demanded, the court will not confer its equitable relief upon the party seeking its interposition and aid, unless he has acknowledged and conceded, or will admit and provide for, all the equitable rights, claims, and demands justly belonging to the adversary party, and growing out of or necessarily involved in the subject-matter of the controversy." Pomeroy Eq. Jur., 3d Ed., Sect. 385.

Conforming to the authorities cited we grant the motion of the appellants Ohio Oil Company and Marathon Oil Company insofar as they complain of the Court's action in remanding the cause to ascertain if the Gulf acted in good faith in making expenditures subsequent to the filing of suit, and judgment is here and now rendered in favor of the Ohio Oil Company and Marathon Oil Company and against the Gulf Production Company, Gulf Oil Corporation and Gulf Refining Company, for the entire mineral leasehold estate and seven-eighths working interests sued for by the Marathon Oil Company and Ohio Oil Company, and for Five Hundred and Thirty-Seven Thousand, Seven Hundred Thirty-Two and 96/100 Dollars ($537,732.-96), with interest thereon from this day at the rate of six per cent per annum, and that Gulf Production Company, Gulf Oil Corporation and Gulf Refining Company take nothing by their cross-action against Marathon Oil Company and the Ohio Oil Company.

If any expressions in our former opinion may be construed as determining that the Gulf should be allowed future operating expenditures they are withdrawn.

Wilbur Brown & Company and other royalty owners, in compliance with our original opinion, have filed schedules showing the amounts accruing to the individual royalty owners under the ruling we made. These calculations have not been contested. The error in the District Court's computation is apparent from the recitals of the judgment. The judgment of the District Court in respect to amounts due royalty claimants is therefore modified to conform to Schedule B filed in this Court by this class of plaintiffs, and, as so modified, is affirmed. Amounts awarded royalty owners will bear interest at the rate of six per cent per annum from February 15, 1938.

We think what has herein been said clarifies sufficiently any obscure expressions in our former opinion, and, together with the views therein expressed upon other issues, sufficiently indicates the conclusions of law upon which the judgment of this Court is based.

Otherwise than as herein indicated all motions for rehearing filed herein are overruled. Parties desiring to file motions for rehearing are granted fifteen days from this date within which to do so.