## GLASSCOCK v. BRADLEY.

### No. 5810.

Court of Civil Appeals of Texas. Texarkana.
June 5, 1941.

Rehearing Denied June 19, 1941.

H. P. Smead and Earl Roberts, both of Longview, and Keys & Holt, of Corpus Christi, for appellant.

Lee & Porter, of Longview, for appellee.

WILLIAMS, Justice.

Mrs. Abigail Guernsey, the mother of Blanche A. Duncan, on May 25, 1931, executed and delivered to Chester W. Lyles an oil and gas lease covering 21 acres described as follows:

"A part of the tract of land consisting of 100 acres, more or less, conveyed by W. R. Samford and wife to Blanche A. Duncan by deed dated December 6, 1902, * * * being out of the G. F. Penn Survey, and the land covered by this lease being described * * * as follows:

"Beginning at a point in the West boundary line of said tract * * * said point being 600 varas North of the Southwest corner of said * * * tract;

"Thence East 370 varas to a point in the E. boundary line of said 100 acre tract;

"Thence N. with said E. boundary line 320.4 varas;

"Thence W. 370 varas to a point in the W. boundary line of said 100 acre tract:

"Thence S. with said W. boundary line 320.4 varas to the place of beginning."

This lease was filed for record May 26, 1931, and will be referred to as the Lyles lease.

Subsequently, on February 12, 1932, Mrs. Guernsey executed and delivered two oil and gas leases to G. C. Dunn, Trustee, covering, respectively, 40 acres more or less, of the 100 acres lying north of above 21 acres, and 40 acres, more or less, lying south of above 21 acres. The description of the latter reads: "The South 40 acres more or less (here follows verbatim description above set out of the Duncan 100-acre tract); * * * being that portion of said 100 acre tract lying South of the following described tract to-wit:" (Then follows verbatim description of the 21 acres above set out).

The description of the north 40-acre lease is identical, except that it is called to be north of the 21-acre lease. The south 40-acre lease, filed for record March 8, 1932, will be referred to as the Quad-A lease.

On January 20, 1939, by assignment from Fred Mellen, receiver, to the appellant, Glasscock, filed for record January 23, 1939, the latter acquired title to the Lyles lease. Thereafter, on March 28, 1939, an assignment from the Estado Petroleum Corporation to appellee, Bradley, the latter acquired title to the Quad-A lease; which

assignment reads to convey "all rights, title and interest of the original lease and present owner in and to said lease and all rights thereunder, together with all personal property used or obtained in connection therewith." It is agreed that title to the Lyles lease by mesne conveyances is now vested in Glasscock, and title to the Quad-A lease is vested in plaintiff, Bradley. Mrs. Abigail Guernsey is the common source of title.

It is to be observed that the foregoing leases each refers to the southwest corner of a 100-acre tract conveyed by Samford to Duncan. This deed refers to the Calvin deed executed in 1870 which calls for a pine 24 inches in diameter situated in the south boundary line of the G. F. Penn Survey, to mark the southwest corner of the 100 acres. Neither this nor any other bearing tree called for in the Calvin deed can now be found.

In a set of field notes prepared by Cunyus from his survey on January 27, 1931, which was recorded February 28, 1931, in the Deed Records of Gregg County, he calls for a post oak to witness a stake for the northwest corner; a sweet gum tree bearing 32° E. 20 feet to witness a stake for its southwest corner; a red oak tree and a well to witness a stake for its southeast corner; a stake on Sabine River for its northeast corner; and being 98.2 acres. Cunyus claims that Lyles was with him when he made the survey, and that he furnished Lyles field notes similar to those used in the Lyles lease.

In the summer of 1939, Hackney made a survey in which he purports to have run and measured the lines from the stakes called for by Cunyus which the latter pointed out to him on the ground. In Hackney's survey he began at the southeast corner as established by Cunyus. Thence ran north 0° 55′ 31″ east 1434.28 vrs. to the northeast corner called for by Cunyus; thence northwest with meanders of Sabine River; thence west 217.86 vrs. to the northwest corner; thence south 0° 39′ 28″ east 1506.97 vrs. to the point located by Cunyus to mark the southwest corner from which a sweet gum stump bears north 58° east 7.2 vrs.; thence north 89° 20′ 22″ east 366.6 vrs. to place of beginning. Hackney drove an iron bolt in the ground to mark the southwest corner of the Duncan tract as located by him.

In this trespass to try title action, pleaded in statutory form, and grounded upon the corners as located by Cunyus and Hackney to mark the southwest corner of the Duncan tract, appellee, W. W. Bradley, seeks to recover of Lonnie Glasscock, defendant below, the title and possession of a ⅞ oil and gas leasehold estate to a .53-acre strip of land 8 vrs. by 374.31 vrs. including an oil well thereon, and the proceeds of the net value of oil produced therefrom between April 1, 1939, and date of trial. The northwest corner of the strip is called to be located 600 vrs. north of the iron bolt, and Hackney's field notes are used to describe the strip. Plaintiff's theory as pleaded and in the evidence introduced by him is that the described strip is part of the land included with the leasehold acquired by him from the Estado Petroleum Corporation.

Defendant answered with a general demurrer, general denial, and plea of not guilty. In his evidence defendant further defended upon an asserted agreed boundary line, and an estoppel. At the close of all evidence, each moved for an instructed verdict. The court instructed the jury to return a verdict for plaintiff. The value of the oil produced from the well in controversy had been agreed upon in the course of the trial. In the decree entered, Bradley recovered judgment for title and possession of the strip and the value of the oil produced therefrom.

Appellant, under his fourth, fifth and sixth propositions, asserts that the undisputed facts establish as a matter of law that the south line of the Lyles lease has been established by recognition and acquiescence as being 1640 feet north of the south line of the Quad-A lease, and that from further undisputed acts, conduct and representations of plaintiff's predecessor in title plaintiff is estopped now to assert otherwise.

In 1931 there was inconsistency as to the south line of the Penn Survey and the north line of the survey to the south called the Dainwood Survey. An application for a mineral lease on an alleged vacancy between the two surveys was made in March 1931. This inconsistency or controversy as to the exact boundaries north and south of the vacancy existed until 1934, when patents issued on the vacancy. Hackney and Elliott both surveyed the area, in 1931. As we interpret Elliott's map introduced by plaintiff for impeachment purposes of Elliott's surveying testimony, Hackney in 1931 located the north boundary line of the

vacancy strip approximately 36 feet south of the north boundary line as located by Elliott. This map indicates that the patent issued by the State locates the north boundary line of the vacancy strip approximately 25 feet north of Elliott's line and some 60 feet north of Hackney's line, and does not agree with either. This line as established by the State pushes the south boundary line of the Penn Survey north from the line marked by Hackney with the iron bolt. A controversy existed between the Gulf leasehold as to its west boundary line and the east boundary line of the Duncan 100-acre tract. The Gulf and the owners of the Lyles and the Quad-A leases settled their differences in a written agreement in 1933. The testimony shows that at one time six stakes were located in the area of Duncan's southwest corner. All the bearing trees called for in the Cunyus field notes had been cut down by the summer of 1939 but the stump of each remained. It is to be observed that Cunyus calls for a sweet gum tree to bear north 32 deg. east 20 ft. from his wooden stake marking his Duncan southwest corner, and Hackney calls for the same tree to be located north 58 deg. east 20 ft. from his iron bolt. Under above Hackney's calls for the Duncan southwest corner, a line projected east from a point 600 varas north thereof would pass 7.8 feet north of the well. Under Cunyus' calls for Duncan's southwest corner, a line so projected west would pass 1.43 feet north of the well. Cunyus claims to have made an error in his bearing call for the sweet gum tree. Elliott's measurement agrees within a little less than a vara to above measurements, but we are unable to determine from his testimony whether more or less. The leases here involved make no call for a sweet gum or a red oak tree, or any other object set out in the Cunyus field notes. They do not call for an iron bolt to mark Duncan's southwest corner. For the beginning corner the leases call for the southwest corner of a tract of land conveyed by Samford to Duncan. And it is apparent from this record that such southwest corner and the Penn south boundary line were not certain in 1931 or 1932. Irrespective of where the true south boundary line of the Penn Survey may now be located, or where it may have been located in 1931, plaintiff and his predecessors in title and defendant and his predecessors in title each and all, over a period of seven years, have dealt

with the south boundary line of the Lyles lease as being 1640.2 feet north of the south boundary line of the Quad-A lease.

Surveyor Rainwater was employed to and did in the spring of 1931 set a location for the first well to be drilled on the Lyles lease. Rainwater claims to have made location for this well after he had first located and established the boundaries of the Lyles lease, and in doing this he followed the corners of the Duncan 100-acre tract as had been located by Cunyus. Rainwater and Cunyus together surveyed out the 21-acre Lyles lease. At that time, in the spring of 1931, Rainwater set wooden stakes for each corner of the Lyles lease as then located by him. From the memorandum of his notes and measurements made by him at the time of the survey, and from Cunyus' set of field notes, Rainwater, assisted by a draftsman in the office, prepared a map, dates February 18, 1932, which purports to show the respective locations with measurements of each of the three leases. Rainwater's measurements show the east line of the Duncan tract to be 110 feet longer, the west line 84.9 feet longer, and his south line 5.77 feet shorter than the respective calls in the Cunyus field notes. Rainwater's map shows the south boundary line of the Lyles lease to be situated 1640.2 feet north of the south boundary line of the Quad-A lease; that is, the east and west boundary lines of the south 40 acres to be 1640.2 feet instead of 600 varas (1666.66 feet). Wooden stakes to mark the four corners of the Lyles lease placed there by Rainwater in 1931 were so located at the time plaintiff and defendant each purchased the respective leases here involved. The well drilled in 1931 was located with reference to the corners marked by Rainwater. Each written application to the Railroad Commission of Texas for a permit to drill 9 wells on the Quad-A lease, and to drill 9 wells on the north 40 acres had attached thereto a copy of the Rainwater map. The 9 wells on the north and the 9 wells on the Quad-A and two additional wells on the Lyles lease were all drilled on locations set with reference to the Rainwater map. When there was pending before the Railroad Commission the application of the receiver of the Lyles lease to drill what plaintiff in his pleading styles the "Lonnie Glasscock No. 2 Duncan" (the well in controversy), Quad Corporation, the then owner and operator of

the south 40-acre lease,. wrote the following letter:

"Dallas, Texas.
September 7th, 1932.
No. 2 T. H. P. Duncan, Gregg County
Case No. 7787
Applicant G. C. Dunn, Receiver.
Mr. R. D. Parker, Chief Supervisor,
Oil and Gas Division,
Railroad Commission of Texas,
Austin, Texas.
Dear Sir:

With reference to application for permit to drill the T. H. P. Duncan Well No. 2, G. F. Penn Survey, Gregg County, Texas, as discussed with you by Mr. Lonnie Glasscock, we hereby waive any objection to location of this well on the Duncan 20 acre lease:

5 ft. North of the North Line
of our 40 acre 'A' Lease and
665 ft. from our No. 3-A well;

and we also agree not to drill between this No. 2-A well and our north boundary line.

Thanking you to give us your approval at an early date, we are
Very truly yours,
Quad Corporation
G. C. Dunn (Signed)
Pres.
GCD:J
Received
Sept 8, 1932
Oil & Gas Division."

According to Elliott's measurements, the Glasscock No. 2 was drilled 668 feet north of Quad's No. 3-A well, and according to Hackney's measurements 664.7 feet north of the No. 3-A well. Glasscock's well No. 2 was completed October 4, 1932, and from such time to the date this suit was filed on October 17, 1939, the oil produced therefrom has been emptied into the battery tanks belonging to the Lyles lease. It was so being operated at the time defendant bought the Lyles lease and at the time plaintiff bought the Quad-A lease. During this period of seven years the owners of the Lyles lease managed and operated the well. In all the assignments, sales, purchases and partitions made during this period of time, the respective owners of the leases dealt with the boundaries as located by Rainwater, although in each assignment the identical field notes as contained in the original leases were used. Dunn, the trustee named in the two 40-acre leases, who later became President of Quad Corporation, and then agent of the Estado Petroleum Corporation, predecessors in title of plaintiff, testified that the north line of the Quad-A lease was at all times recognized as being 1640 feet north of its south line. Dunn was present at the time defendant bid in and paid $45,900 to the receiver for the Lyles lease. Before plaintiff consummated his purchase of the south 40 acres for $180,000 from the Estado Petroleum Corporation, he caused a petroleum engineer to examine and appraise the value of 9 wells. The well in controversy was not appraised by his engineer. This record is devoid of any evidence that plaintiff's predecessors in title ever at any time laid any claim to the well, or questioned the south boundary line of the Lyles lease as had been located by Rainwater on his map 1640.2 feet north of the south boundary line of the Quad-A lease. Indisputably such line so located by Rainwater has been recognized and acquiesced in over a period of seven years; so recognized when defendant paid $45,900 for the Lyles lease; and so expressly represented in writing before the well situated on the strip in controversy was drilled. Under the foregoing observations, Bradley's predecessors in title were estopped and Bradley is now estopped as a matter of law from asserting otherwise. As stated in 19 Am.Jur. p. 681, "A party may be estopped to insist upon a claim, * * * or take a position which is inconsistent with an admission which he has previously made and in reliance upon which the other party has changed his position." And in the language of Dickerson v. Colgrove, 100 U.S. 578, 580, 25 L.Ed. 618, 619, " * * * he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. * * * This remedy is always so applied as to promote the ends of justice." 11 C.J.S., Boundaries, § 67, page 642, § 69, page 643, § 80, page 653; 19 Am.Jur. p. 809; 21 C.J. p. 1107; Dickerson v. Colgrove, supra; Anderson v. Jackson, Tex.Sup., 13 S.W. 30; Garza v. Brown, Tex.Sup., 11 S.W. 920; Schiele v. Kimball, Tex.Civ.App., 150 S.W. 303; Marathon Oil Corp. v. Gulf Oil Corp., Tex. Civ.App., 130 S.W.2d 365.

For the reason above stated, the judgment of the lower court is reversed, and judgment here rendered that appellee Bradley take nothing by his suit.